IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUL KIET PHAM,**<br><br>Petitioner,<br><br>v.<br><br>**JERRY POWERS,**<br><br>Respondent. | **Case No. 1:13-cv-00656 MJS (HC)**<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY** |

Petitioner is a state probationer proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, Los Angeles County Chief Probation Officer, is represented by William K. Kim of the office of the California Attorney General. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 6, 17.)

I.       **PROCEDURAL BACKGROUND**

Petitioner is currently on probation supervised by Los Angeles County pursuant to a judgment of the Superior Court of California, County of Madera, following his conviction by a jury on June 21, 2010 of felony communicating with a minor with the intent to commit oral copulation and misdemeanor annoying or molesting a minor. People v. Kiet Pham, 2012 Cal. App. Unpub. LEXIS 1194, 1-2 (Feb. 15, 2012). On

1   December 1, 2010, the trial court placed Petitioner on felony probation with 120 days of

2   local jail time, and ordered him to register as a sex offender pursuant to California Penal

3   Code § 290. Id.

4        Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

5   District. (Lodged Doc. 9.) On February 15, 2012, the court affirmed the judgment.

6   (Answer, Ex. A, ECF No. 28.) Petitioner filed a petition for review with the California

7   Supreme Court on March 21, 2012. (Lodged Doc. 12.) The Supreme Court summarily

8   denied the petition on May 9, 2012. (Lodged Doc. 13.)

9        Petitioner filed the instant federal habeas petition on May 6, 2013. (Pet., ECF No.

10  1.) Petitioner later filed a second amended petition on November 8, 2013. (2nd Am. Pet.,

11  ECF No. 24.) The second amended petition serves as the operative petition in this

12  matter. In the petition, Petitioner presents three claims for relief: 1) that the trial court

13  violated his due process rights in by not excluding prejudicial statements of witness

14  Brandon Belt; 2) that it was a violation of his equal protection rights to require mandatory

15  sex offender registration for a conviction of communicating with a minor with the intent to

16  commit oral copulation; and 3) that it was a violation of his equal protection rights  to

17  require mandatory sex offender registration for conviction of annoying or molesting a

18  minor. (2nd Am. Pet. at 16.)

19       Respondent filed an answer to the petition on January 14, 2014, and Petitioner

20  filed a traverse to the answer on February 14, 2014. (Answer and Traverse, ECF Nos.

21  27, 30.) The matter stands ready for adjudication.

22  **II.    STATEMENT OF THE FACTS[1]**

23       One evening, motel manager Kamlesh Patel testified, an "Asian
    guy"—a "skinny, tall, little bit old man"—walked into his motel and asked
24  about rooms and prices. After Patel showed him one room, the man asked
    to see another, left without saying anything, and walked across the street
25  to the fire station. Asked whether he would recognize him, Patel replied,
    "I'm not sure. Maybe, may[be] not."
26

27       [1]The Fifth District Court of Appeal's summary of the facts in its February 15, 2012 opinion is
    presumed correct.  28 U.S.C. § 2254(e)(1).

28

2

Volunteer firefighter Brandon Belt testified that he and about a half-dozen other firefighters were cleaning the fire truck when Pham walked over from the motel across the street and asked if there were any other hotels. Pham said that the motel across the street "wasn't a very nice one." Belt agreed that the motel across the street was "not the best." He could see quality was an issue for Pham and pointed out where the other hotels were. Pham asked if he could use the phone, and Belt said he could, but 20 or 30 minutes later Pham was still on the phone. All of the other firefighters had gone home.

Belt saw that Pham was not talking on the phone and, in reply to his question why, Pham said his friend had put him on hold. Belt said he had to lock up and go home. He asked Pham to hang up. Pham hung up, walked outside with Belt, and asked a few more questions about the location and quality of the other hotels. Belt testified that Pham asked him if there was a "brothel" in town. Belt did not know what a "brothel" was and he told Pham he was not sure.

Belt thought Pham "kind of seemed confused" when he asked if Belt had any friends with whom he could stay. Feeling comfortable about neither the question nor the "smirk on his face," Belt replied in the negative and said he had to lock up the fire station and go home. He called a police sergeant with whom he communicated from time to time and described the clothes Pham was wearing and the direction he was walking. "If he was going to ask somebody else that question, he could be in danger," Belt testified, adding, "And if you were to ask the wrong person that question, not being from the town, you could wind up getting severely hurt." As Belt was about to leave the fire station, he saw Pham talking to three boys down the street.

All three boys—who were 14, 15, and 16 years old—testified. The 14 year old testified that Pham asked "if we had a place to stay for him" and that the boys told him about "a hotel down the street" but that he said "he didn't like it." After the boys told him where another hotel was, he said, "No, I don't have that much money." He said he preferred to "stay at a house or something." Then he asked, "Are you trying to get money?" The 15 year old said, "Well, that depends." Pham asked, "Are you going to give me head?" The 15 year old replied, "Hell no," and started yelling at him. Pham walked away in one direction as the boys walked away in another direction. The 14 year old testified he was "70 percent sure" Pham used the word "head" and "100 percent sure" he asked for oral sex, but acknowledged he testified, "I'm pretty sure," at a prior proceeding when asked, "Are you sure that's what he said?" To the 14 year old, "pretty sure" was about the same as "100 percent sure." He was "not completely sure" if Pham used the word "head" and acknowledged he used the word "bed" to ask about a place to stay.

The 16 year old testified that Pham asked "weird questions" about staying the night, taking a shower, and sleeping on a couch or in a bed and then asked the 15 year old "to give him head." All three boys said "no." Pham asked about another place to stay. As the boys started "listing off places around town," Pham slowly started walking away. When the 16 year old talked with a police officer that night, he "wasn't too sure" whether Pham asked for "head" or "sex." At trial, he was positive that Pham asked for "head."

3

The 15 year old testified that Pham asked if he could take a shower at one of their houses and if he could sleep on one of their couches. The boys said "no." Pham asked the 15 year old if he wanted to make some money. "Well, sure," he replied, and he asked Pham what he had to do. Pham said that "if I was to give him head he would give me money." Some of Pham's words were difficult to make out. The 15 year old told the prosecutor that Pham was speaking English but "had a very bad accent" and that he could "barely understand him." The parts he could not make out he filled in with context.

As the 15 year old turned and started walking away, Pham started walking away in the other direction. The two other boys approached the 15 year old as he was walking away and asked, "Where are you going? Are you going home?" He replied, "Yeah. I'm going to go tell my mom to call the cops on this guy because he just propositioned me for sex." When he said that, the other boys responded differently. The 14 year old had a shocked look on his face. The 16 year old started laughing. "[He] thought I was joking around."

The 15 year old admitted that in 2007, when he was a freshman in high school, he called in a bomb threat that led to the evacuation of the school. As officers searched "for the bomb that was not there," he tried to let them know that "it was just a joke," but they thought he was "just messing around" and said, "Get out of here." He never called law enforcement, the fire department, the school, or anyone else to admit responsibility.

A police officer executing a search warrant for Pham's car found evidence that "someone had been traveling with a lot of belongings" and perhaps even living in his car. The officer found no evidence that someone might have been soliciting sex from a minor.

When Belt got home, he looked up "brothel" out of curiosity. He found out that a "brothel" is "a prostitution house." He was not sure what a hostel is. Asked whether the question posed to him was, "Is there a brothel or a YMCA?" he testified, "Could have been, I don't recollect." After refreshing his recollection with a prior transcript, defense counsel asked him, "[W]hen Mr. Pham asked you about the brothel, did he ask, 'Is there a brothel or a YMCA?'" He testified, "Yes."

The lead Saturday night services pastor at a church in Visalia characterized Pham not only as a devout Christian who attended church regularly but also as a "very culturally and linguistically different" person. As a mandated reporter, the pastor was instructed to look for inappropriate behavior by adults toward children. He never received a report from anyone about any inappropriate behavior by Pham and never observed anything inappropriate about Pham's behavior with teenaged boys, including his own two sons, with whom Pham had probably 80 to 100 contacts with no other adults around. Asking to stay at a stranger's house was consistent with Pham's "extremely frugal" character. Sometimes he stayed in the homes of strangers, some of whom were church members, some of whom were not, and sometimes he stayed the night in his car to save money. The pastor said, "He has a problem with stuttering, and English is not his first language," so "his English is hard to understand."

4

1
2
3
4
5
6

The pastor's wife, the director of the Saturday night children's department at the church, was also a mandated reporter. The charge Pham was facing at trial did "not line up with any behavior [she had] seen around other children or [her] children, who are the same age boys." Pham did not, in her opinion, have an inappropriate liking for young men. After four years of observing him, she had never received a report from anyone about any inappropriate behavior by him. He "can be difficult to understand at times" because "English is not his first language and he has a tendency to stutter." So "a lot of times you'll ask him to repeat himself or to slow down" and "have to have it in context to be able to understand what he's saying."

7
8
9
10

One of the teenaged sons of the pastor and his wife characterized Pham as "socially awkward." "Almost naïve," he testified, noting that Pham did not understand how just starting "a conversation with younger people" is "not normal" in our society. Asked if he had encountered "anything inappropriate, awkward or odd" in his contacts with Pham, he testified, "Inappropriate, no[;] awkward or odd, yes." He had never heard Pham use slang terminology.

11
12
13

Pham did not testify. The defense called witnesses who testified to Pham's good character and stated that his heavy accent made it difficult at times to understand him. Defense counsel argued to the jury that Belt may have misunderstood Pham and mistook "brothel" for "hostel." Defense counsel also argued that the boys may have mistakenly heard Pham say "head" when he actually said "bed."

14

People v. Pham, 2012 Cal. App. Unpub. LEXIS 1194, 2-9 (Cal. App. 5th Dist. Feb. 15, 2012).

15

## III.   GOVERNING LAW

16

### A.   Jurisdiction

17
18
19
20
21
22
23
24
25

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.   Legal Standard of Review

26
27
28

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

1    filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

2    114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

3    the AEDPA; thus, it is governed by its provisions.

4         Under AEDPA, an application for a writ of habeas corpus by a person in custody

5    under a judgment of a state court may be granted only for violations of the Constitution

6    or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

7    7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

8    state court proceedings if the state court's adjudication of the claim:

9         (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established federal law, as
10        determined by the Supreme Court of the United States; or

11        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the State
12        court proceeding.

13   28 U.S.C. § 2254(d).

14                  1.     Contrary to or an Unreasonable Application of Federal Law

15        A state court decision is "contrary to" federal law if it "applies a rule that

16   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

17   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

18   result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

19   "AEDPA does not require state and federal courts to wait for some nearly identical

20   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

21   even a general standard may be applied in an unreasonable manner" Panetti v.

22   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

23   "clearly established Federal law" requirement "does not demand more than a 'principle'

24   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

25   decision to be an unreasonable application of clearly established federal law under §

26   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

27   (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-

28   71 (2003).  A state court decision will involve an "unreasonable application of" federal

1   law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at

2   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

3   Court further stresses that "an *unreasonable* application of federal law is different from

4   an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

5   U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

6   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

7   correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

8   U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

9   have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

10  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

11  Federal law for a state court to decline to apply a specific legal rule that has not been

12  squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

13  (2009), quoted by Richter, 131 S. Ct. at 786.

14              2.        Review of State Decisions

15            "Where there has been one reasoned state judgment rejecting a federal claim,

16  later unexplained orders upholding that judgment or rejecting the claim rest on the same

17  grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

18  "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

19  (9th Cir. 2006).    Determining whether a state court's decision resulted from an

20  unreasonable legal or factual conclusion, "does not require that there be an opinion from

21  the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

22  "Where a state court's decision is unaccompanied by an explanation, the habeas

23  petitioner's burden still must be met by showing there was no reasonable basis for the

24  state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does

25  not require a state court to give reasons before its decision can be deemed to have been

26  'adjudicated on the merits.'").

27            Richter instructs that whether the state court decision is reasoned and explained,

28  or merely a summary denial, the approach to evaluating unreasonableness under §

1    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

2    or theories supported or, as here, could have supported, the state court's decision; then

3    it must ask whether it is possible fairminded jurists could disagree that those arguments

4    or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

5    Thus, "even a strong case for relief does not mean the state court's contrary conclusion

6    was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

7    authority to issue the writ in cases where there is no possibility fairminded jurists could

8    disagree that the state court's decision conflicts with this Court's precedents." Id.  To put

9    it yet another way:

10         As a condition for obtaining habeas corpus relief from a federal
           court, a state prisoner must show that the state court's ruling on the claim
11         being presented in federal court was so lacking in justification that there
           was an error well understood and comprehended in existing law beyond
12         any possibility for fairminded disagreement.

13   Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

14   are the principal forum for asserting constitutional challenges to state convictions." Id. at

15   787. It follows from this consideration that § 2254(d) "complements the exhaustion

16   requirement and the doctrine of procedural bar to ensure that state proceedings are the

17   central process, not just a preliminary step for later federal habeas proceedings." Id.

18   (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

19                      3.      Prejudicial Impact of Constitutional Error

20         The prejudicial impact of any constitutional error is assessed by asking whether

21   the error had "a substantial and injurious effect or influence in determining the jury's

22   verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

23   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

24   state court recognized the error and reviewed it for harmlessness).  Some constitutional

25   errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

26   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

27   (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

28   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

1   Strickland prejudice standard is applied and courts do not engage in a separate analysis

2   applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin

3   v. Lamarque, 555 F.3d at 834.

4   **IV.**     **REVIEW OF PETITION**

5         **A.**     **Claim One – Failure to Exclude Evidence**

6         Petitioner contends the trial court's denial of a motion to exclude the statements of

7   firefighter Belt was a violation of Petitioner's due process rights. (2nd Am. Pet. at 17-20.)

8   Specifically, Petitioner claims that Belt's testimony regarding Petitioner asking about a

9   brothel violated his due process rights. (Id.)

10             1.     State Court Decision

11         Petitioner presented his claim in his direct appeal to the California Court of

12   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

13   Court of Appeal and summarily denied in subsequent petition for review by the California

14   Supreme Court. (See Lodged Docs. 9-13, Answer, Ex. A.) Since the California Supreme

15   Court denied the petition in a summary manner, this Court "looks through" the decisions

16   and presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last

17   state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

18   804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that

19   higher court agrees with lower court's reasoning where former affirms latter without

20   discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000)

21   (holding federal courts look to last reasoned state court opinion in determining whether

22   state court's rejection of petitioner's claims was contrary to or an unreasonable

23   application of federal law under 28 U.S.C. § 2254(d)(1)).

24         In denying Petitioner's claim, the Court of Appeal explained that:

25   I. Admission of "Brothel" Testimony

26         Pham moved in limine to exclude firefighter Belt's testimony that
    Pham asked him if there was a "brothel" in town. Defense counsel argued

27   that "the prejudice far outweighs any probative value." In opposition, the
    prosecutor argued that Belt's testimony was "quite relevant" to show that

28   he and Pham spoke English without any problem understanding each

1

2

other and that Pham talked with the 15 year old after he talked with Belt. The prosecutor argued that Pham's "inquiring about a brothel and other such things in the area really goes to the heart of the specific intent that's required for the charges in this case."

3

4

5

6

7

8

Arguing that Belt's testimony was "cumulative" to evidence that Pham spoke English and then talked with the 15 year old, defense counsel focused on Belt's testimony that Pham asked about a brothel. Commenting that "a major part of the defense's case" at his first trial "was whether or not he asked for a brothel or a host[el]," defense counsel observed that the word "brothel" was just part of the question, "'Is there a brothel or a YMCA here?'" Defense counsel argued: "Whether it's brothel or host[el] is not relevant to prove any element of the offenses." Finally, "even if he did ask for a brothel, the probative value in that is diminished by the prejudice that far ... exceeds any probative value."

9

10

11

12

13

The court characterized Belt's testimony about speaking with Pham in English as "relevant" and his testimony about corroborating Pham's subsequent conduct as "useful." As to "the inquiry concerning a brothel, the specific inquiry about a brothel itself is not an element of the charge here, but if believed by the jury, that would be an indication that the person making the inquiry is out seeking some sort of sexual gratification. And that, I believe, is relevant to this proceeding." Finding that the prejudice did not outweigh the probative value (Evid. Code, § 352), the court denied the motion.

14

A. Relevance and Evidence Code Section 1101

15

16

17

18

19

20

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section[] 1101 .... [Citations.]" (People v. Harrison (2005) 35 Cal.4th 208, 230.) The trial court has considerable discretion in determining the relevance of evidence. (People v. Clark (2011) 52 Cal.4th 856, 922 (Clark).) "A court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]" (People v. Osband (1996) 13 Cal.4th 622, 666.) The exercise of a court's discretion will not be disturbed on appeal unless it is shown that the trial court exercised its discretion "'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125 (Rodrigues).)

21

22

23

24

Here, the trial court ruled the brothel testimony admissible, not because it tended to show Pham had a propensity to commit sex crimes (Evid. Code, § 1108), but because it was pertinent to two major issues in the case: Pham's ability to speak and be understood in the English language and his intent to seek sexual gratification (Evid. Code, § 1101, subd. (b)).

25

26

27

28

As to the first issue, witnesses testified that Pham spoke with a heavy accent. One of the defense contentions was that the prosecution witnesses misunderstood what Pham said to them, suggesting that Belt heard "brothel" when Pham said "hostel" and that the boy may have mistook "bed" for "head." Since proof of the crimes charged depended on the words spoken, and because the defense maintained that the prosecution witnesses were mistaken as to what they heard Pham say, a conversation that Pham had with Belt minutes before he spoke with the

boys was relevant on the issue of the ability of Pham to speak English and the ability of others to understand his speech.

The second reason for admitting this evidence was that it was relevant to prove Pham's intent—that is, if, minutes before speaking to the boys, he expressed interest in locating a brothel, a place where one pays money for sex, such evidence tended to support the boy's testimony that Pham asked him if he wanted to make money by giving him "head." From this evidence, it was reasonably inferable that Pham wanted sex and was willing to pay money for it. While Evidence Code section 1101 generally renders inadmissible evidence of a person's character in the form of specific instances of conduct, such prohibition does not apply when the evidence is admitted to prove some fact such as motive or intent. Here, the defense contended that Pham never asked for oral sex and therefore either the boy fabricated the testimony that Pham asked for oral sex or misunderstood his words when Pham merely inquired about a place to stay overnight. The brothel remark constituted some evidence that Pham had sex on his mind and was willing to pay for it minutes before he spoke with the boys. One reasonable inference that could be drawn from this evidence was that Pham wanted oral sex and was willing to pay for it, regardless of whether it was with a female adult or with a boy under the age of 18. The fact that paying for sex at a house of prostitution is not identical to propositioning a boy about oral sex did not render the brothel remark inadmissible under Evidence Code section 1101. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (People v. Ewoldt (1994) 7 Cal.4th 380, 402 (Ewoldt).) The brothel remark tended to reveal Pham's state of mind—that he desired sex and was willing to pay money for it. This evidence was probative of Pham's motive and intent, and tended to validate the boy's account of what Pham said to him and rebut the defense argument that the boy misunderstood what Pham had said.

People v. Earle (2009) 172 Cal.App.4th 372 (Earle) does not support Pham's assertion that the brothel testimony should have been excluded. In Earle, the defendant was charged with indecent exposure and sexual assault. The two crimes occurred months apart and involved different victims. The trial court denied a motion to sever the charges for trial. The Court of Appeal, in a two-to-one decision, reversed the assault conviction, concluding the trial court abused its discretion in denying the motion to sever because, absent expert testimony to the contrary, the commission of the indecent exposure did not rationally support an inference that the perpetrator had a propensity or predisposition to commit rape. (Id. at p. 398.)

Unlike Earle, this case concerned the application of Evidence Code sections 352 and 1101, not a motion to sever. Nor was the brothel testimony offered to show a propensity to commit a crime. Also, the brothel testimony contained two independent relevant bases for admission: Pham's ability to speak and be understood in the English language and his intent to seek sexual gratification. Earle is not in conflict with the trial court's ruling in this case.

At oral argument, Pham cited Clark, supra, 52 Cal.4th 856 in support of his contention that the brothel remark was not relevant. In Clark, the defendant was charged with, inter alia, first degree murder during an attempted rape. The trial court allowed, over defense objection,

11

1

2

3

the defendant's wife to testify that she and the defendant last had sexual relations two weeks before the murder. The high court agreed with the defense that to infer from such evidence that the defendant was sexually frustrated and thus motivated to rape was highly speculative and therefore irrelevant; however, under the facts of the case, the error was harmless. (Id. at p. 924.)

4

5

6

7

8

9

10

Clark's facts are distinguishable from our case. In the instant case, the jury had to determine what Pham actually said to the boys and what his intent was when he said it. The brothel conversation with Belt occurred minutes before Pham's conversation with the boys. In both conversations, Pham arguably expressed an interest in paying money for sex. Unlike the highly speculative connection between the evidence Clark had not had sex with his wife during the two weeks before the murder and his intent to rape, here the connection between asking about a brothel and minutes later propositioning a minor for sex was not so highly speculative as to render it irrelevant. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (Ewoldt, supra, 7 Cal.4th at p. 402.)

11

12

We find no abuse of discretion in admitting this evidence as against the claims that it was not relevant or that it violated Evidence Code section 1101.

13

B. Evidence Code Section 352

14

15

16

Having determined that the brothel testimony was otherwise relevant and admissible on two different grounds, we now turn to the question of whether the trial court abused its discretion in overruling Pham's Evidence Code section 352 objection to this evidence as unduly prejudicial.

17

18

19

20

21

Evidence Code section 352 permits the trial court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. Undue prejudice means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt. (People v. Tran (2011) 51 Cal.4th 1040, 1048 (Tran).) Again, we review the lower court's ruling under the abuse of discretion standard of review. (People v. Pollock (2004) 32 Cal.4th 1153, 1171.)

22

23

24

25

26

27

28

Here, the subject testimony was probative on two separate grounds: Pham's ability to communicate in English and his intent. So, the probative value of this testimony was substantial. This evidence was not prejudicial within the meaning of Evidence Code section 352 simply because it was probative of Pham's guilt. (Tran, supra, 51 Cal.4th at p. 1048.) Whether this evidence was inherently prejudicial to the defense is debatable since it tended to validate the defense position that Pham's broken English caused others to misunderstand what he said. Even if such evidence carried some prejudicial effect because it portrayed Pham in a bad light (seeking prostitution), we cannot say as a matter of law that it was unduly prejudicial or that it is probable the prejudice substantially outweighed its probative value. The trial court did not act "'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (Rodrigues, supra, 8 Cal.4th at pp. 1124-1125.)

1    We find no abuse of discretion.

2    People v. Kiet Pham, 2012 Cal. App. Unpub. LEXIS 1194 at 9-18.

3    However, the decision was not unanimous. Dissenting, one justice stated:

4         This case turns on a single word. Did Pham ask about comparable lodgings, as the defense attorney suggested? ("Is there a hostel or a YMCA here?") Or did he ask about polar opposites, as the firefighter

5    testified? ("Is there a brothel or a YMCA here?")

6         Testifying that he had no idea what a "brothel" or a "hostel" was, the firefighter admittedly had absolutely no context to help him figure out

7    what Pham — indisputably a socially awkward immigrant with a very bad accent — asked. Yet the court allowed him to testify Pham asked about a

8    brothel.

9         Evidence is prejudicial within the meaning of Evidence Code section 352 if it uniquely tends to evoke an emotional bias against a party

10   as an individual or would cause the jury to prejudge a person on the basis of extraneous factors. (People v. Cowan (2010) 50 Cal.4th 401, 475.)

11   Without the firefighter's testimony, nothing in the record showed, let alone intimated, a nexus between an adult male's propensity to commit a sex act

12   with a consenting adult female prostitute and an adult male's propensity to commit a sex act with a juvenile male legally incapable of consenting. The

13   testimony of the firefighter, a first responder with credibility as a witness and respect in the community, branded Pham as a sexual predator on the

14   prowl.

15        Finding the firefighter's testimony admissible under Evidence Code section 1101, subdivision (b), the majority fails to appreciate the grave

16   prejudice of his testimony under Evidence Code section 352. I am left to surmise that reasonable minds may differ on whether reasonable minds

17   can differ. I would reverse the judgment.

18   Pham, 2012 Cal. App. Unpub. LEXIS 1194 at 19-21.

19        2.    Analysis

20        As Respondent correctly argues, the United States Supreme Court has expressly

21   left open the question of whether the admission of propensity evidence violates due

22   process. See Estelle v. McGuire, 502 U.S. at 75, n.5; Garceau v. Woodford, 275 F.3d

23   769, 774 (9th Cir. 2001). In Estelle, the Supreme Court expressly refused to determine

24   whether the introduction of prior crimes evidence to show propensity to commit a crime

25   would violate the Due Process Clause. Id. ("Because we need not reach the issue, we

26   express no opinion on whether a state law would violate the Due Process Clause if it

27   permitted the use of 'prior crimes' evidence to show propensity to commit a charged

28   crime."); see also Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) ("Estelle

13

1    expressly left this issue an 'open question'"). Because the Supreme Court has

2    specifically declined to address whether the introduction of propensity evidence violates

3    due process, Petitioner lacks the clearly established federal law necessary to support his

4    claims. Id.; see also Mejia v. Garcia, 534 F.3d 1036, 1046-47 (9th Cir. 2008) (relying on

5    Estelle and Alberni and concluding that the introduction of propensity evidence under

6    California Evidence Code § 1108 does not provide a basis for federal habeas relief, even

7    where the propensity evidence relates to an uncharged crime); Holley v. Yarborough,

8    568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court "has not yet made a clear

9    ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

10   process violation sufficient to warrant issuance of the writ.").

11           Accordingly, the state courts' rejection of Petitioner's claim could not have been

12   "contrary to, or an unreasonable application of, clearly established" United States

13   Supreme Court authority, since no such "clearly established" Supreme Court authority

14   exists. 28 U.S.C. § 2254(d)(1).

15           Nevertheless, there can be habeas relief for the admission of prejudicial evidence

16   if the admission was fundamentally unfair and resulted in a denial of due process.

17   Estelle, 502 U.S. at 72; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v.

18   Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Gordon v. Duran, 895 F.2d 610, 613 (9th

19   Cir.1990). Constitutional due process is violated if there are no permissible inferences

20   that may be drawn from the challenged evidence. Jammal v. Van de Kamp, 926 F.2d

21   918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise

22   more than one inference, some permissible, some not." Id. at 920. "A habeas petitioner

23   bears a heavy burden in showing a due process violation based on an evidentiary

24   decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

25           Here, the California Court of Appeal appropriately found that the evidence was

26   properly admitted to show that despite Petitioner's accent, others could understand what

27   he was saying, and also to show intent with regard for his desire for potential sexual

28   gratification. The Court of Appeal sufficiently protected Petitioner's due process rights by

1  finding that the Superior Court had not abused its discretion in applying Rule 352 to

2  admit the statements Petitioner made to firefighter Belt. The Court of Appeal found the

3  probative value of the evidence outweighed the danger of prejudice. Pham, 2012 Cal.

4  App. Unpub. LEXIS 1194 at 9-18 (applying Cal. Evid. Code § 352). The Court of Appeal

5  found the testimony probative based on Petitioner's ability to communicate in English

6  and his intent. Id. The Court of Appeal then balanced this probative value against the

7  prejudicial nature of the evidence and found that it was debatable whether the evidence

8  was prejudicial, as it may have shown only that Petitioner' English was hard to

9  understand. Accordingly, the Court of Appeals concluded that they "cannot say as a

10  matter of law that it was unduly prejudicial or that it is probable the prejudice

11  substantially outweighed its probative value" and that the trial court did not act "in an

12  arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of

13  justice." Id. at 18.

14       This Court must defer to the Court of Appeal's conclusions with regard to

15  California Law, Bains v. Cambra, 204 F.3d 964, 972 (9th Cir. 2000) (citing Wainwright v.

16  Goode, 464 U.S. 78, 84, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983)). The Court finds that

17  this analysis adequately addressed the permissible inferences of Petitioner's statements

18  to firefighter Belt, and the fundamental fairness of its introduction. The California Court of

19  Appeal decision denying this claim was not contrary to clearly established Supreme

20  Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

21  **B.    Claims Two and Three – Equal Protection Violation From Placement on Sex
22        Offender Registry**

        Petitioner, in his second and third claims, contends that the state court's order
23
    requiring him to register as a sex offender violated his constitutional rights to equal
24
    protection. (2nd Am. Pet. at 23.)
25
              1.    State Court Decision
26
        In the last reasoned decision denying Petitioner's claim, the appellate court
27
    concluded:
28

1

2

3

4

5

6

> Pham was convicted of both communicating with a minor with the intent to commit oral copulation (§§ 288.3, subd. (a), 288a) and annoying or molesting a minor (§ 647.6, subd. (a)). He was ordered to register as a sex offender pursuant to section 290. He contends that this order denies him equal protection of the law, citing People v. Hofsheier (2006) 37 Cal.4th 1185 (Hofsheier). Hofsheier held that persons convicted of oral copulation with a 16 year old (§ 288, subd. (b)(1)) are similarly situated with persons convicted of unlawful sexual intercourse with a 16 year old (§ 261.5, statutory rape), and therefore requiring the former but not the latter group to register is an unconstitutional deprivation of equal protection of the law. (Hofsheier, supra, at pp. 1207-1208.)

7

8

9

10

11

12

> Assuming, without deciding, that requiring registration for a conviction of communicating with a minor with the intent to commit oral copulation violates equal protection, the same cannot be said for requiring registration for a conviction of annoying or molesting a minor. A person convicted of annoying or molesting a minor is not similarly situated with one convicted of statutory rape or communicating with a minor with the intent to commit oral copulation. Section 647.6, subdivision (a) targets conduct that is objectively disturbing and motivated by an abnormal sexual interest in the minor. (People v. Lopez (1998) 19 Cal.4th 282, 290.) The registration requirement in this case was valid based on the section 647.6, subdivision (a) conviction alone.

13

Pham, 2012 Cal. App. Unpub. LEXIS 1194 at 18-19.

14

> 2.    Applicable Legal Authority and Analysis

15

The Equal Protection Clause of the Fourteenth Amendment "is essentially a

16

direction that all persons similarly situated should be treated alike." See City of Cleburne,

17

Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313

18

(1985); see also Fraley v. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993) (per

19

curiam). Where a statute is challenged on equal protection grounds, "[t]he general rule is

20

that legislation is presumed to be valid and will be sustained if the classification drawn by

21

the statute is rationally related to a legitimate state interest." See City of Cleburne, 473

22

U.S. at 440. A statutory sentencing scheme that does not disadvantage a suspect class

23

or infringe upon the exercise of a fundamental right, as is the case here, is subject only

24

to rational basis scrutiny. See Von Robinson v. Marshall, 66 F.3d 249, 250-51 (9th Cir.

25

1995) (per curiam); United States v. Harding, 971 F.2d 410, 412 (9th Cir. 1992). To

26

prevail on his equal protection challenge, petitioner "must prove that there exist no

27

legitimate grounds to support the classification." See Harding, 971 F.2d at 413.

28

The Court concurs with the finding of the California Court of Appeal that persons

1     convicted of annoying or molesting a minor are not similarly situated with one convicted

2     of statutory rape or communicating with a minor with the intent to commit oral copulation

3     since the elements of the two crimes are different. The California Supreme Court has

4     found that there was a violation of Equal Protection for requiring sex offender registration

5     for the crime of voluntary oral copulation with a minor, when registration was not required

6     for the crime of voluntary sexual intercourse with a minor. See People v. Hofsheier, 37

7     Cal.4th 1185 (2006). However, at least one California Court of Appeal has denied Equal

8     Protection challenges to the crime in question here, annoying or harassing a minor,

9     because the perpetrators of the two crimes are not similarly situated. The court

10    explained:

11             It is true that a violation of section 647.6, subdivision (a), can
12    potentially involve conduct that is much less overtly sexual than the felony
      sex offenses found subject to discretionary registration pursuant to
13    Hofsheier. In fact, as appellant notes, it can be violated by mere words, as
      occurred here. Whatever the nature of the conduct, however, to be
14    convicted under section 647.6, subdivision (a), a defendant's objective
      conduct would need to have "'unhesitatingly irritated or disturbed a
15    reasonable person had it been directed at that person regardless of the
      defendant's intent.'" (People v. Lopez, supra, 19 Cal.4th at p. 291.) Hence,
16    section 647.6 is distinguishable from Hofsheier-type offenses, which do
      not include this requirement and which all involve voluntary conduct
17    between two willing parties.

18             Moreover, appellant's focus on conduct alone ignores another key
      difference between the voluntary sex offenses examined in Hofsheier-type
19    cases and section 647.6, subdivision (a), in that the latter statute is limited
      to a "comparatively narrow province," i.e., to offenders whose conduct, in
20    addition to being objectively irritating and disturbing, is motivated by an
      unnatural or abnormal sexual interest in children. (Gladys R., supra, 1
21    Cal.3d at pp. 867–868.) Thus, while section 647.6 does not have a
      specific intent requirement, the requirement that the conduct be motivated
22    by an unnatural or abnormal sexual interest in children further
      differentiates it from Hofsheier and other cases involving voluntary sexual
23    offenses.

24             Finally, while older minors may be victims under section 647.6, and
      while the perpetrator need not be more than 10 years older than the
25    victim, the statute also encompasses the youngest of minors as well as
      perpetrators who are much older than their victims. Indeed, the statute's
26    use of an objective standard to determine whether a "normal person,
      without hesitation, would have been disturbed, irritated, offended, or
27    injured by the defendant's conduct" (CALCRIM No. 1122; see People v.
      Lopez, supra, 19 Cal.4th at p. 290) may well stem, at least in part, from
28    the fact that the statute's scope includes very young children who might
      not be subjectively irritated by the conduct, as well as from the

17

1

2

Legislature's objective "that childish and wholly unreasonable subjective annoyance [not be] covered" (People v. Lopez, supra, 19 Cal.4th at p. 290).

3

4

5

Thus, for all of these reasons, section 647.6, subdivision (a), simply is not comparable to the voluntary sex offenses at issue in Hofsheier-type cases, in which the only difference between the crimes was the nature of the sexual act and, in some cases, the ages of the defendant and the victim.

6

People v. Brandao, 203 Cal. App. 4th 436, 445-446 (Cal. App. 1st Dist. 2012).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

The Court agrees with the reasoning of the Brandao decision. Regardless, Petitioner has pointed to no federal authority, let alone any Supreme Court authority, which stands for the proposition that equal protection is violated by requiring a defendant to register as a sex offender if he is convicted of annoying or molesting a minor. Reliance on Supreme Court authority broadly discussing the Equal Protection Clause does not advance his argument. See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) ("[W]hen a Supreme Court decision does not 'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court . . . it cannot be said, under [the] AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision.") (citation omitted). It therefore follows that the Court has no basis for finding or concluding that the California courts' rejection of Petitioner's equal protection claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law.

21

22

23

24

25

26

27

28

Finally, to the extent petitioner is contending that the registration requirement violates state law, this claim is not cognizable on federal habeas review. Habeas relief is not available for claims of an alleged error in the interpretation or the application of state law. See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984); see also Sturm v. Cal. Adult Auth., 395 F.2d 446, 448 (9th Cir. 1967) (per curiam) (observing that "a state court's interpretation of its statute does not raise a federal question"). Moreover, this Court may not revisit the State courts' interpretation of

1    its own laws. See Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d

2    407 (2005) (per curiam).

3         Accordingly, the state court adjudication of the claim did not result in a decision

4    that was contrary to, or involved an unreasonable application of, clearly established

5    Federal law, or result in a decision that was based on an unreasonable determination of

6    the facts in light of the evidence. 28 U.S.C. § 2254(d). Petitioner is not entitled to relief.

7    **V.    CONCLUSION**

8         Petitioner is not entitled to relief with regard to the claims presented in the instant

9    petition. The Court therefore orders that the petition be DENIED.

10   **VI.   CERTIFICATE OF APPEALABILITY**

11        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

12   appeal a district court's denial of his petition, and an appeal is only allowed in certain

13   circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

14   in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

15   provides as follows:

16        (a) In a habeas corpus proceeding or a proceeding under section 2255
17        before a district judge, the final order shall be subject to review, on appeal,
          by the court of appeals for the circuit in which the proceeding is held.

18        (b) There shall be no right of appeal from a final order in a proceeding to
19        test the validity of a warrant to remove to another district or place for
          commitment or trial a person charged with a criminal offense against the
20        United States, or to test the validity of such person's detention pending
          removal proceedings.

21        (c)    (1) Unless a circuit justice or judge issues a certificate of
          appealability, an appeal may not be taken to the court of appeals from–
22

23                 (A) the final order in a habeas corpus
                   proceeding in which the detention complained
                   of arises out of process issued by a State
24                 court; or

25                 (B) the final order in a proceeding under
                   section 2255.
26

27        (2) A certificate of appealability may issue under paragraph
          (1) only if the applicant has made a substantial showing of
          the denial of a constitutional right.
28

19

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## VII.  ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:     December 8, 2014                         /s/ *Michael J. Seng*
                                                   UNITED STATES MAGISTRATE JUDGE